2496 Southern Iowa, Wildhawk Investments v. Brava I.P. et al. Good morning, Your Honors. May it please the Court, my name is John Fredrickson, and I am representing Appellants Billy Bob Boer, Brava I.P., and Paragon Roof Systems, who are appealing the entry of a preliminary injunction entered by the District Court that effectively prohibits Mr. Boer from using the experience that he acquired in over 25 years of working in the field of composite roofing products. The party's briefs cover numerous issues, and I intend this morning to focus my attention on three areas. The proper interpretation and application of the 2017 Non-Disclosure Agreement, or NDA, the Defense of Equitable Estoppel, both of those relate to the element of likelihood of success on the merits, and then I'll also spend a moment on the element of irreparable harm under the database factors. Your Honors, we believe the fundamental error of the District Court was its treatment of a Non-Disclosure Agreement entered by the parties in May 2017. And the District Court's error with respect to the NDA infected both its interpretation of the 2015 Restated and Amended License Agreement, which I'll refer to as the 2015 License, and the Court's analysis of Equitable Estoppel. The NDA, which was executed about 18 months after the 2015 License, explicitly memorialized the party's intent regarding the scope of a first right of refusal granted by Mr. Boer and Mr. Edson to Wildhawk, and I think the language is very important, so I'm going to read it from paragraph 3 of the NDA. As part of the Amended and Restated Technology License and Purchase Agreement dated November 25, 2015, it was agreed that Billy Bob Boer and Gerald Edson would give recipient first right of refusal on all new R&D developments that they develop related to the composite roofing industry. The District Court really dismissed the NDA, explaining that the parties submitted inconsistent understandings of its terms and concluded that there was no meeting of the minds that was necessary to form a valid contract. The Court failed to either identify or discuss the evidence that the parties offered regarding their understandings of the NDA. Mr. Boer, Brava IP, and Paragon, their understanding is based on the unambiguous language of the NDA itself, whereas Wildhawk's only evidence on that point is the hindsight testimony of its witness at the preliminary injunction hearing, Adam Brantman, that essentially contradicts the plain language of the NDA. Where the operative language in the NDA gives Wildhawk first right of refusal on all new R&D developments related to the composite roofing industry, Wildhawk is contending, based on Mr. Brantman's testimony, that the first right of refusal applies only to developments that are outside the field of use, which is a defined term that means the manufacture and sale of quality roofing shingles. In the face of the unambiguous language in the NDA regarding the scope of the first right of refusal, it was an error of law for the district court to give any credence to Mr. Brantman's testimony regarding his or Wildhawk's supposed unexpressed understanding regarding the scope of the first right of refusal. Consequently, as a matter of law, the 2017 NDA must be construed in accordance with its plain language, giving Wildhawk no more than a first right of refusal to new product developments in the field of composite roofing, and Mr. Fredrickson, correct me if I'm wrong, but in my recollection, I seem to recall the district court basically setting off the the language in the original agreement with the second, with the NDA, and by putting them in juxtaposition and saying that what was sold to the defendant, or to the the plaintiff in this case, excuse me, not the plaintiff, but that was sold to Wildhawk, what was sold to them, the know-how and the patents and all of that, that all of that would have precluded the ability of this second agreement to have retained something into the future for  Is that an accurate assessment of the district court's reasoning as to the relationship between these two agreements? I would say not exactly, your honor. In my reading of the court's opinion, the court said I don't even need to look at this 2017 NDA because there was no meeting of minds regarding it. So it's as if that agreement didn't exist. It's not that one controlled the other, it was just that the second one was a nullity. In effect, the court treated it as a nullity, yes, your honor, and we believe that there's no way that that can be upheld after looking at the plain and unambiguous language of this agreement. There's no dispute between the parties that there was included in the overall agreement in 2015, a first right of refusal. The disagreement is what the scope of that first right of refusal was. And your view is that the the NDA answers that question as to what the scope is. Absolutely, your honor, and as I just noted... Yes, your honor, was there a question? Go ahead, answer the judge's question. I was just going to say that that's exactly correct, and the language I read explicitly says that the 2017 NDA reflects what the parties agreed to orally in 2015. So there is no way that that can be divorced and abandoned when the court was trying to interpret the 2015 written agreement. Oral evidence rule and a partially integrated document, a contract doctrine, I mean because I think there's all this handshake deal that's floating around out there. You know, I'm, you know, varying the terms that were imposed because the lender set some limitations, right? And then notwithstanding that, they have a super-secret deal that they still have the super-secret deal. It's no longer in the contract. Then you've got the NDA that comes later, which arguably I get where you're saying that that's a contract that it must vary the terms of the original agreement, and that constitutes some sort of an ovation as opposed to just giving structure to what the handshake deal was. I mean, doesn't it? I mean, I'm having a hard time with the idea that you can have the super-secret handshake agreement and somehow that, you know, undermines the contract. Now, I get where all of this is really important stuff when you get to equitable estoppel, but I'm having a hard time on contract principles trying to figure out where we're going here. Sure. Well, your honor, I think I can, the way I can address that is that I think it is proper under the parole evidence rule to consider what the parties later committed to writing was their oral understanding in 2015. And so, I believe that the proper, my opinion is the proper approach is to try to reconcile the NDA language with the balance of the 2015 restated and amended license agreement. We've laid out in our brief how we think we can do that. But to the court's point, I believe that if that is not accepted by the court as a way to go about it, you're absolutely correct that to the extent the NDA is inconsistent with the 2015 license, it supersedes that agreement to the extent of those inconsistencies and overrides it to the extent of those inconsistencies. The 2015 license includes a provision that it can be modified by the parties by means of a written agreement. And, you know, the NDA is a written agreement, unambiguous in our view, signed by both parties to the extent it's inconsistent with the 2015 license in any way and can't be reconciled. It supersedes it and its provisions control. So, I think either way we believe the language of the NDA controls the scope of the first right of refusal. Thank you. I'd like to move quickly then to the to the issue of equitable estoppel and as Judge Erickson noted, again, the NDA is very significant with respect to that issue. The district court concluded without discussing any evidence that we failed to provide clear and convincing evidence of either a misrepresentation or an intent that the misrepresentation be acted on. But we believe that the clear and convincing evidence comes out of Wildhawk's own mouth in its briefing in the district court. On the issue of whether that whether the NDA rep was a false representation, Wildhawk stated in its briefing in the district court, excuse me, Wildhawk stated that the first first right of refusal language in the NDA did not accurately state Wildhawk's understanding of the right of first refusal arrangement. I don't know how much more compelling evidence you can get that the NDA misrepresented Wildhawk's understanding. We submit that's clear and convincing evidence. With respect to the issue of an intent that Mr. Boer acted on it, again, I return to Wildhawk's own mouth in their briefing in the district court where they admitted that although the NDA did not reflect its understanding of the first right of refusal, quote, Wildhawk executed the NDA in an effort to continue its valuable relationship with Mr. Boer. Now in their briefing they suggest, well, the valuable relationship didn't relate to the development of these products. But we've pointed out in our brief multiple pieces of evidence in the record that the valuable relationship extended beyond just sales consulting. What was under discussion was a new R&D structure. The proposals that were going back and forth regarding the Natura product involved further research and development by Mr. Boer and Mr. Edson. So the notion that somehow there was not an intent that Mr. Boer and Mr. Edson continued progress on this Natura product line is just belied by the record. Your Honor, I see I'm approaching my rebuttal time, so unless there are any other questions at this point, I reserve the balance of my time. Thank You, Mr. Fredrickson. Mr. Brower. Thank you. May it please the court and counsel. In 2015, as the court has seen from the briefing, my client, Wildhawk Investments, paid approximately four million dollars to obtain, to acquire the assets of the Brava defendants, Mr. Boer and Brava IP. We're here talking about a written document that was part of that acquisition, the amended and restated technology license agreement, which I will just refer to as the agreement for purposes of argument today. The primary dispute between the parties, in our view, is very straightforward. What was it that Wildhawk acquired in the deal? And another way to state that, what was the intent of the parties at the time they entered into this agreement? I think it's important to note first in the district court's ruling, Judge Jarvie noted, and I'm quoting, the contract definitions of what was sold is very broad. The contracts are a model for conveying everything that a seller of intellectual property has. The contract of interpretation, of course, begins and ultimately ends with the language that the parties chose to use in their agreement. Here, the appellant, Paragon, the entire argument, since the beginning of this case, has been that what Wildhawk acquired was nothing more than the right to manufacture and sell four specific lines of roofing products. Those were listed in Exhibit A to the agreement. The court reviewed an extremely large record, which is before this court, and heard lengthy testimony from the relevant witnesses and observed their demeanor, and in our view, correctly rejected Paragon's interpretation as inconsistent with the plain language of the agreement, and respectfully, we still... What's your perspective of the existence of the handshake agreement, as it's been referred to in the materials, and the NDA? What function did those serve? Judge Smith, as the record reflects, I think, and I believe is undisputed, the initial draft, or an initial draft, of the agreement included a right of first refusal provision, and as was noted previously, that was removed at the request of Wildhawk's lender. Yeah, my client does not dispute that the parties continued with what's been called the handshake agreement. However, their position is that the agreement was consistent with what was the provision that was stricken, the new product applications provision. Yeah, I want to highlight first, as we're talking about... Why isn't it conceivable that the ultimate NDA that the parties did agree to was, in essence, putting back into the agreement the right of first refusal? Well, your honor, I think we, I think the parties agree that there was a handshake agreement, and that agreement was part of the party's agreement in 2015. I don't think there's a dispute about that. Paragat's position here has been that the NDA was simply reciting the agreement that had been made in 2015, and we agree with that. Well, if that's the case, then why in the world, if you bought everything and paid for everything that the plaintiff created, or ever would create, basically, why would there need to be an agreement contemplating the idea that some future developed product, that they would offer to sell it to you if you already bought it? Your honor, I think to answer that question, first, I think we have to talk about the context of the NDA. This was in May of 2017. This was a document that Mr. Bohr submitted to my client, and if you look at it, what the agreement is, is essentially an agreement of confidentiality with some things that Mr. Bohr wanted to show my client. The language that we're talking about was inserted into that agreement. My client signed it. The language, as we pointed out in our briefing, is entirely consistent with the original agreement, and to get to your honor's initial question, Wildhawk did purchase everything that is encompassed in the license as set forth in the agreement. Well, counsel, I guess another question occurs to me. If it's going to be someone's intent to violate an agreement that they've entered into, particularly if they plan to do it and know it's in violation, that they wouldn't contact the, they wouldn't make this kind of an overture saying, look, I've developed this, or I am developing this. We want to sell it. We're going to sell these, but we'd like to give you the opportunity to purchase it first. That would have seemed to have been the perfect time to say, no, we're not going to buy it, and you can't sell it. It's not even yours to sell. Instead of simply saying, no, we're not interested, giving the impression that Mr. Boer could proceed with developing whatever he was developing and establishing whatever business opportunities he thought appropriate. Your honor, respectfully, we don't agree that the execution of that document gave Mr. Boer that impression. This document was simply, as the record reflects, signed by my client so they could look at some things that Mr. Boer wanted to show them. That meeting at that time, as the record I think reflects, was very perfunctory, and nothing went forward on that point. You know, I get the idea that that's true at that time, but subsequent to that, there's basically an offer that says buy it, or we're going to make it, right? And there's a decision made to remain silent. Now, in the ordinary rules of evidence, staying silent in the face of facts in which one would reasonably be expected to protest is, in fact, an admission that that is true, right? Now, that's an evidentiary thing that kind of cuts all across both contract and tort and criminal law, right? But if you look at the contract law, there's some pretty clear cases out there that, in the estoppel world, that says that if you don't raise an objection under circumstances when a person would ordinarily be expected to raise the objection, and the other party relies on that and goes forward, that you're estopped, right? And now you're saying that's not the case here, and I'm trying to figure out why isn't that the case here. What's your best argument? Sure, you're correct, Your Honor. That is our position. That's not the case here. The discussions that Wildhawk continued to have sporadically with Mr. Boer about what we'll call the Natura line, as Mr. Brantman testified, at that time, recall, Mr. Boer was still a independent contractor with Wildhawk. He remained under contract with us until 2019. He was our highest paid employee. He was the face of our company in many ways. So we had an ongoing relationship with him. In the discussion about whatever it was that Mr. Boer was developing, which we have very limited knowledge, those discussions related to, hey, is there a way for us to work together on something if the plan is to move forward at some point? Yeah, those discussions related, as I think the record reflects, to the acquisition of the machinery that might be necessary to make such a product, the molds, reimbursement for testing, things of that nature. And so as Mr. Brantman testified, we, being Wildhawk, weren't really clear at any point during that time whether this was a product that used our technology or not. We were having business discussions with Mr. Boer about whether there was a possibility to move forward. In our position, and we've cited case law for the court, is that is not a misrepresentation. The NDA, in our view, is not a misrepresentation in any way for the reasons we've set forth in our briefing. And so, Your Honor, that's our response there. I do want to just dovetail back, if I've answered Your Honor's question, that frankly our view is a lot of these arguments are intended to take away from the plain language of the deal that was struck in 2015, which Judge Jarvie, we would submit in his opinion, performed his interpretation and construction of the contract properly under Iowa law. And it's apparent from his opinion in the document itself that Wildhawk was purchasing something much broader than the four product profiles at issue. Frankly, our view, if the contract interpretation arguments that Paragon makes are accepted, the contract becomes essentially meaningless. What they propose the contract means could have been drafted on a page or two. It could have simply said you're buying the rights to make these products. That's not what was purchased. And so a lot of these arguments that are being made respectfully are simply, in our view, a red herring taken away from what was actually acquired in the acquisition. Counsel, let me ask a question regarding the preliminary injunction analysis. One aspect of the analysis is having the requirement that there be damage that can't really be repaired. Having something take place that you can't get corrected. Isn't what's really a dispute here the potential for loss of market share and sales? Because of the niche market that these tile products are in. Why wouldn't damages be able to provide an adequate remedy in a case like this where pretty good numbers could probably be worked out economically to indicate what, if any, impact the new company's sales with its products that may prove to be violative of the agreement? Why couldn't those numbers be determined and remedy available through damages? Your Honor, I would respond to that in a couple of ways. Your Honor is correct. If the question is simply, hey, company A sold a million dollars worth of product and that should have gone to company B, we're within the framework that Your Honor talked about. Here, we're talking about something different. The circumstances of this case are very unique. Your Honor pointed out this is a very niche market that really has one large player and several smaller players like my client and Mr. Fredrickson's client fighting for what remains of that market. And here, Mr. Bohr was, as I indicated, the face of our company, stayed with our company. When he re-entered the market, and this is in the record with the Paragon Defendant's website, broadcast repeatedly his association with Bravo Rooftile. Talks at length about the Bravo Rooftile brand and highlighting that association. And as we pointed out in our brief, Mr. Bohr's only sales representative was in the practice of telling consumers who knew Mr. Bohr well as the face of our product, that Paragon, the new company, was actually the parent company of the loss of market share, which is a different concept, I think, than simply lost sales. Concluded that there was a risk of reputational harm in confusion in the marketplace under those circumstances, the unique circumstances of this case. Yeah, so we would submit that would be the basis, and I think it's clear from Judge Jarvee's ruling, that was the basis for his holding. And we believe that his review of the facts was not clearly erroneous, and it was not an abuse of his discretion under the unique facts here to rule as he did. And I would also point out, you know, Mr. Bohr, even at the injunction hearing, testified to the court, look, if I'm enjoined, I can't even begin to pay my supplier contracts. And unrecoverable economic loss, if there is an economic loss component here, is a relevant factor for the court to consider in that analysis. So it's our position here that the court's factual findings underlying its decision were not clearly erroneous. And as a result, the court did not abuse its discretion here. I would just finally note as well, your honors, the other factors which we've not talked about, I won't address. Balance of the harms, public interest factors, etc. We think the court did not abuse its discretion there. And again, our view is this case is governed by what was purchased. The parties obviously have radically different views about what that was. We would submit Judge Jarvee correctly adopted Wildhawk's understanding of that agreement. And these factors we're talking about that occurred after the agreement, we submit Judge Jarvee was correct. May I ask about the balancing of harms just briefly? And my question really is this, is that does the timing of your clients stating its objections, does that figure into the balancing of harms? What I'm really thinking about is this, is by failing to object to the interpretation of the agreements, then Mr. Boer went out and obtained millions of dollars of equipment, not realizing that there was a dispute. And is that a harm that you can just explain away? I guess that's really my question. Yeah, Your Honor, it's not a factor that I think the parties addressed or Judge Jarvee addressed. I'll respond briefly. I'm not sure that the record establishes clearly that Mr. Boer didn't think there was an issue here. But addressing your point, I think it is a factor that potentially could be relevant in the balance of harms analysis. Here, you know, I would submit that Judge Jarvee's conclusion that the defendants or the appellants here made the conscious decision to proceed. Yeah, Wild Hog, as the court noted, entered into an agreement, paid four million dollars to protect its rights. And so if that consideration, Your Honor, talks about factors in, in view of all four factors together, we don't think that that would have any effect on Judge Jarvee's ultimate conclusion, which again, we think properly was not an abuse of his discretion. Thank you, Your Honors. Thank you. Thank you, Mr. Bauer. Mr. Gregerton, you're rebuttal. Thank you, Your Honor. Just a few points. On the last point that Mr. Bauer made, there is record evidence, testimony from Mr. Boer that we referenced in our briefs, that had he known Wild Hog had a legitimate claim to the, to the Natura products he was developing, he never would have launched Paragon and invested all of his own money into that. So that stands as that. Secondly, the notion that Wild Hog didn't get what it paid for is, is frankly, in our view, kind of silly. You know, they bought the ability to manufacture roofing tiles. They're now, they've more than quintupled their sales from in five years. Neither Mr. Boer nor Mr. Edson, although they had independent contractor agreements that extend for a year, neither of them were obligated to do any research and development or develop new products. Both of them had non-compete agreements that have long since expired. So the notion that Wild Hog didn't get what it paid for is, is just not, not supported by the record. And I also want to take issue with Mr. Bauer's assertion that the, that the language of the NDA regarding the first right of refusal is entirely consistent with everything they went before. Wild Hog is saying that the right, first right of refusal applies to things that are outside the field of use. Outside the field of roofing shingles. The first right of refusal as stated in the NDA says the first right of refusal pertains to products in the composite roofing industry. Those two are not consistent and there's no way to say that they are. Third point, Mr. Bauer suggested that the NDA was entered somewhat casually and that they didn't recognize the significance of this language inserted by Mr. Boer. Well, it was, if you look at the record, it was submitted by Mr. Boer to Wild Hog. It was not something that was penciled in at the last minute. It was part of the document as delivered. That document was circulated to Wild Hog's five partners, all of whom agreed that it should be entered with the language as it was. And it also cannot be disputed that what is now the Paragon products had been specifically identified to Wild Hog as subject to the first right of refusal. So in August of 2016, just a few months after the license agreement was signed, Mr. Boer disclosed three products and he said in his email disclosing these products, here are three products that are covered by our first right of refusal. We're giving you a shot at it. So to suggest that this was something that was entered lightly and Wild Hog didn't know the significance of, again, is belied by the record. I see that my time is expiring and, Your Honor, I'll close and just ask the court respectfully to reverse the decision of the district court and vacate the preliminary injunction. Thank you, Mr. Fredrickson. Thank you also, Mr. Boer. Court appreciates both counsel's argument to the court this morning. We will continue to review the materials that you've submitted and render decision as prompt as possible. Thank you both. I appreciate it. You may be excused. Thank you.